UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RONALD E. RUSSELL, | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. C-06-93 |
| | § | |
| DEGUSSA ENGINEERED CARBONS, | § | |
|     Defendant | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Ronald E. Russell filed this lawsuit asserting that his former employer, Degussa Engineered Carbons, ("Degussa") violated his rights under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621.  Plaintiff also argued that he was subjected to intentional infliction of emotional distress.  Defendant filed a motion for summary judgment on December 21, 2006 (D.E. 14) to which plaintiff responded on January 30, 2007 (D.E. 15).[1]

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

## BACKGROUND

In 1968 plaintiff began working for Ashland Oil and Refinery in Belpre, Ohio and transferred to an Ashland Plant in Aransas Pass, Texas in 1984 (Deposition of Ronald Russell,

---

[1]Plaintiff's response was filed over two weeks late but defendant has not moved to strike it as untimely.

D.E. 14-3, pp. 25, 30[2]).  The Ashland company was acquired by Degussa in 1988 and plaintiff

continued to work for Degussa until his termination (Russell Depo., D.E. 14-3, pp. 34-36).

Degussa is an international corporation with many manufacturing lines, and at its plant in

Aransas Pass, Degussa produced carbon black from refined crude oil (Russell Depo., D.E. 14-3,

pp. 27-28, 35).  Carbon black is used to reinforce natural rubber (Russell Depo., D.E. 14-3, p.

28).

Plaintiff became the plant manager at the Aransas Pass facility in 1992, making him the

senior person at the site.  His duties included setting the plant budget, complying with safety and

environmental requirements at the plant and overseeing plant operations (Russell Depo., D.E.

14-3, pp. 52-53; Decl. of Jeff Malenky, D.E. 14-2, para. 4).

In 1997 Degussa offered plaintiff a transfer to a plant in Belpre, Ohio but plaintiff turned

down the offer for personal reasons (Russell Depo., D.E. 14-3, pp. 40-41).  Degussa wanted to

use the Aransas Pass facility to train plant managers and superintendents and also wanted to

rotate plant managers (Russell Depo., D.E. 14-3, pp. 41-42; Malenky Decl., D.E. 14-2, para. 5).

When plaintiff turned down the transfer to Ohio, Degussa created a position called

"Senior Operations Manager" at the Aransas Pass plant and offered it to plaintiff (Russell Depo.,

D.E. 14-3, p. 43; Malenky Decl., D.E. 14-2, para. 6).  Plaintiff's duties in the position included

training new plant managers and superintendents and assisting the plant manager in running the

facility (Russell Depo., D.E. 14-3, p. 42; Malenky Decl, D.E. 14-2, para. 6).  Plaintiff accepted

the position for which he received the same amount of pay he had been receiving and all the

other perquisites of his previous position.  Donnie Loubiere became the plant manager and

---

[2]These page numbers refer to the page numbers of the deposition transcript.

plaintiff trained him in the position (Russell Depo., D.E. 14-3, pp. 42-43).  Plaintiff held the

position until he left on short-term disability leave in 2001 (Russell Depo., D.E. 14-3, p. 44;

Malenky Decl., D.E. 14-2, para. 6).

       In 1984 plaintiff started having what he described as "spells" where he would turn gray

in color and his energy level would drop and he would develop a terrible headache (Russell

Depo., D.E. 14-3, pp. 46-47).  He also reported blurred vision, dizziness, numbness to his facial

areas, memory loss and balance problems (Plaintiff's Summary, attached as Ex. 1 to Russell

Depo., D.E. 14-4, p. 31[3]).  When he would have a spell, plaintiff would have to lie down for

anywhere from an hour to the rest of the day.  Over the years plaintiff was treated for a blocked

blood vessel leading to his brain, anxiety, vertigo, and angina attacks (Id.)

       Plaintiff described himself as having a "9, 9" personality, meaning that he had a very

strong personality and was driven to do the best he could in his job.  He would correct people

strongly when they did not do their job and used profanity when he was yelling at employees

(Russell Depo., D.E. 14-3, pp. 44-46).

       In June 2001 two department superintendents told plaintiff that the customer service

department had requested that the plant change product types the following day.  Upon hearing

the details of the request, plaintiff determined that it would be impossible to fulfill the request

because the tank needed to produce the product was full of a different type of product and would

have to be emptied before it could be used to make the requested product (Plaintiff's Summary,

D.E. 14-4, pp. 29-30).

---

    [3]The page number referred to here is the number assigned to the document by the District
Clerk's Office.

Plaintiff told the superintendents to stay in his office while he called the customer service department on the speaker phone to discuss the options for accommodating their request. Plaintiff was upset because he thought that the superintendents should have solved the problem before going to him (Id.).  Plaintiff called the customer service department and reached the voice mail of the person who had made the request.  He left a message on the person's voice mail and then, forgetting to disconnect the speaker phone, proceeded to loudly discuss his opinion of the customer service department, saying that they were bean counters and lacked knowledge of plant operations (Id.).  He also explained to the superintendents that they should have discussed the matter with the customer service department and the three of them then discussed their plans to empty the tank and proceed to filling the request (Id.).  Plaintiff used profanity when he described the customer service department, although most of his ire was directed at the superintendents for their not having realized that the request would be impossible to fill from one day to the next (Russell Depo., D.E. 14-3, pp. 66-67).

About three days after the speaker phone call, the plant manager told plaintiff that Johnny Covey, the general manager for the carbon black operation, would be arriving at the plant and wanted to talk to plaintiff.  At the meeting, Covey played the message plaintiff had inadvertently left on the customer service employee's voice mail.  Plaintiff conceded that the message was unprofessional and Covey told him that the vice president of sales was concerned that plaintiff did not have the best interest of the plant in mind (Plaintiff's Summary, D.E. 14-4, p. 30).

The next day plaintiff and Covey met again and plaintiff told him that he planned to e-mail both the customer service representative and the vice president of sales and to explain that his real frustration was with the superintendents.  In addition, he would call and apologize to the

customer service representative with whom he had left the message.  He also offered to transfer to another location so that he would not jeopardize any specialty product sales at the Aransas Pass plant.  Covey told him that he did not need to transfer and that they would wait until the first of the year to see how the incident played out (Id. at 30-31).

Plaintiff began to train the superintendents and plant manager to manage the plant in case he was transferred in 2002 and was able to have everyone trained and certified to manage the plant in his absence.  During the same time period, plaintiff experienced three spells and on September 7, 2001 was enveloped by what he later described as a deep black hole of depression. His depression was exacerbated by family problems.  These stressors culminated in plaintiff becoming very ill and finding himself unable to get out of bed on September 7, 2001.  Plaintiff was unable to return to work until early 2004 (Id. at 31).

Plaintiff eventually was diagnosed with post traumatic stress disorder, severe anxiety and major depression.  Following treatment with medication and physical therapy and a stint as an out-patient at a behavioral hospital, plaintiff realized that his problems were mental rather than physical.  His treatment resulted in an end to the spells and a decrease in his symptoms (Id. at 32).

When plaintiff first left the job in September 2001, he was on short-term disability from September 7, 2001 through March 8, 2002, at which time he was placed on long-term disability. He understood that there was a two-year cap on his ability to receive disability income (Russell Depo., D.E. 14-3, p. 102).  Plaintiff's long-term disability was set to expire on March 8, 2004 (Russell Depo., D.E. 14-3, p. 111).  Plaintiff was released by his psychiatrist, his cardiologist and his family physician in February 2004 (Plaintiff's Summary, D.E. 14-4, p. 32).

After his physicians released him to return to work, plaintiff contacted Jeff Malenky and told him that he wanted to return to work and intended to go to the plant on March 1, 2004. Despite his two-and-a-half year absence, plaintiff believed that he was entitled to return to his previous job as senior operations manager (Russell Depo., D.E. 14-3, pp. 127-129).

Plaintiff met with Malenky and Covey on March 17, 2004 and they told him that there were no open positions at Degussa (Russell Depo., D.E. 14-4, p. 136).  Plaintiff believed that another employee, Justin Lang, had been moved from production manager or production superintendent to operations manager, and he thought that Lang had been moved after plaintiff had informed Degussa that he was ready to return to work (Russell Depo., D.E.14-4, p. 137). During the meeting Malenky told plaintiff that they were looking at the possibility of hiring him as a consultant at either the plant in Orange, Texas, or in Borger, Texas (Russell Depo., D.E. 14-4, pp. 138-139).  Both Malenky and Covey were concerned about plaintiff's ability to handle the stress of the job (Russell Depo., D.E.14-4, p. 139).

A few days later plaintiff received an offer to work as a consultant at the Orange, Texas plant.  His duties would be training employees, revising and reviewing procedures as needed and learning the material flow manager's position so that he could fill in when the material flow manager was on vacation.  Plaintiff was paid $500 per day and he was told that Degussa was not withholding taxes and he would have to file taxes as an independent contractor (Russell Depo., D.E. 14-4, pp. 141-143).

On March 26, 2004 Degussa mailed plaintiff a letter that referred to the Degussa retirement plan and showed a termination date for plaintiff of March 1, 2004.  Plaintiff was

shocked by the termination date, but understood that he was terminated as of that date (Russell Depo., D.E.14-4, pp. 144-145).

Plaintiff elected to receive his retirement pay as a lump sum on April 12, 2004 and completed paperwork for retiree medical coverage on April 13, 2004 (D.E. 14-5, pp. 20-25).  He signed the paperwork because he was being told he had no job (Russell Depo., D.E. 14-4, p. 147).  Plaintiff believed he was treated fairly regarding his pay for the consulting work (Russell Depo., D.E.14-4, pp. 153-154).

While working as a consultant, plaintiff did not get along well with Mike Smith, a production manager at the plant.  Smith would not attend training meetings and would not discipline employees who were wasting time playing on their computers.  Plaintiff determined that Smith did not know very much about operations at the plant and was trying to hide his lack of knowledge.  Plaintiff and Smith had a confrontation, but voices were not raised and no profanity was used (Russell Depo., D.E. 14-4, p. 159-162).  Plaintiff also gave one supervisor "disciplinary action" for inappropriate use of the computer (Russell Depo., D.E. 14-4, p. 163).

Plaintiff worked as a consultant at the Orange plant until October 2004 when he needed to go to Ohio for three weeks.  When he returned, he contacted his supervisor at the Orange plant who told him that he was not needed at the plant until January 2005 (Russell Depo., D.E. 14-4, pp. 164-165).  In January 2005 plaintiff called the Orange, Texas plant to see about returning to work, but he learned that they did not intend to hire him either as an employee or as a consultant (Russell Depo., D.E. 14-4, pp. 168-169).

Plaintiff filed a charge of discrimination with the Corpus Christi Human Relations Commission on June 3, 2005, alleging that he was discriminated against on October 1, 2004

when he was told by the director of production that his services would no longer be needed but that he might be needed again in or after January 2005.  Petitioner asserted discrimination based on age and disability (EEOC Charge, D.E. 14-5, pp. 27-28).  In his original complaint, plaintiff claims that he received a "right to sue" letter from the EEOC, but there is no copy of the letter in the file.  Defendant does not dispute that plaintiff received the letter.

In the motion for summary judgment, defendant argues: (1) plaintiff's claim that Degussa failed to rehire him in March 2004 is time-barred; (2) plaintiff cannot prevail on his claim that he suffered age and disability discrimination when his consulting relationship was terminated because Degussa was not his "employer" at that time; and (3) plaintiff cannot show that the position he sought was open or available.

Defendant also argues that plaintiff cannot establish an ADA claim because (1) there is no record of a disability; (2) his alleged disability was temporary; (3) he cannot establish that the decision-makers relied upon the record and (4) the only accommodation plaintiff sought was his old position back.

Regarding his ADEA claim, defendant argues that (1) plaintiff's disparate impact claim is factually and legally deficient and (2) Degussa offered a legitimate, non-discriminatory reason for not re-employing plaintiff.  Finally, defendant argues that plaintiff abandoned his intentional infliction of emotional distress claim at his deposition, that it is otherwise pre-empted by his employment discrimination claim and that there is insufficient evidence of extreme and outrageous conduct.

## APPLICABLE LAW

### A.  Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See FED.R.CIV.P. 56(c).  An issue is material if its resolution could affect the outcome of the action.  Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir.), cert. denied, 122 S. Ct. 347 (2001).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of the party opposing the motions.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The Court will not weigh the evidence or evaluate the credibility of witnesses.  Caboni v. General Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The movant bears the initial burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If the movant demonstrates there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  To sustain this burden, the nonmovant cannot rest on the mere allegations of the pleadings.  See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Caboni, 278 F.3d at 451; FED.R.CIV.P. 56(e).  After the nonmovant has been

given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted.  Caboni, 278 F.3d at 451.

A.      **Limitations Period**

In a state like Texas, which provides a state or local administrative procedure for addressing complaints of employment discrimination, a title VII plaintiff must file a charge with the EEOC within 300 days of learning of the conduct alleged.  Huckabay v. Moore, 142 F.3d 233, 238 (5th Cir. 1998)(citing 42 U.S.C. § 2000e-5(e)(1).  The same 300-day filing rule applies to ADEA cases and ADA cases.  See Clark v. Resistoflex Co., A Div. of Unidynamics Corp., 854 F.2d 762, 765 (5th Cir. 1988) and Ramirez v. City of San Antonio, 312 F.3d 178, 181 (5th Cir. 2002).  The limitations period begins to run at the time a complainant knows or reasonably should have known that the challenged act has occurred.  Id. (citations omitted).

At his deposition, plaintiff testified that he absolutely understood that as of March 1, 2004 he was working as a consultant and not an employee of Degussa (Russell Depo., D.E. 144-4, pp.142-145).  His understanding was based on the fact that as a consultant, (1) Degussa did not  withhold income taxes or contribute to Social Security on his behalf, (2) he received paperwork related to receiving his retirement pay and (3) a letter from Degussa on March 26, 2004 referred to his termination date of March 1, 2004 (Degussa letter, D.E. 14-5, p. 13).

The limitations period extends back 300 days from June 3, 2005, or to August 7, 2004. Any claims premised on actions of Degussa occurring before August 7, 2004, are time barred. To the extent plaintiff is complaining about the actions of Degussa in failing to rehire him or converting his status to that of a consultant in March of 2004, all such claims are time-barred. To the extent plaintiff is complaining about actions of Degussa from October 2004 to January

2005 when he was told that no additional consulting jobs would be forthcoming, his June 3, 2005 complaint to the EEOC fell well within the 300 day limitation period, and these claims are not barred by limitations.

**B.      Employee for purposes of ADA and ADEA**

Defendant argues that for purposes of the ADA and ADEA, plaintiff's status as a paid consultant excludes him from the definition of employee for purposes of ADA and ADEA.  Both plaintiff and defendant agree that plaintiff was a "consultant" from March 2004 through October 2004, but that designation would not automatically exempt him from coverage under the statutes. In the Fifth Circuit, when determining whether an employment relationship exists within the meaning of the ADEA or the ADA, a court should apply a hybrid economic realities/common-law control test.  <u>Deal v. State Farm Mut. Ins. Co. of Tex.</u>, 5 F.3d 117, 118-19 (5th Cir. 1993); <u>Mares v. Marsh</u>, 777 F.2d 1066 (5th Cir. 1985).  When applying the economic realities/common-law control test, the right to control an employee's conduct is the most important consideration. <u>Deal</u>, 5 F.3d at 119.  Factors considered include the right of the employer to set an employee's work schedule, the right to supervise an employee and the ultimate right to hire or terminate an employee.  <u>Id.</u>  The economic realities portion of the test looks at whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment.  <u>Id.</u>

Neither party discussed or applied the economic realities/common-law control test to the facts of this case.  In his affidavit Malenkey stated that as a consultant plaintiff was only intended to be a resource for Dugussa employees, he had no supervisory authority over Degussa employees and Degussa had no control over plaintiff's activities (Decl. of Jeff Malenky, D.E.

14-2, para. 13).  In the same paragraph Malenky states that plaintiff was to train employees, free up the materials flow manager for other training and to be available to provide assistance to the plant manager (Decl. of Jeff Malenky, D.E. 14-2, para 13).  According to plaintiff Degussa controlled plaintiff's work schedule, supervised him, had the ultimate right to hire or terminate him, and set the terms and conditions of his employment, though he was paid as an independent contractor (Aff. of Ronald Russell, D.E. 15-2, p.2; Russell Depo., D.E. 14-3, pp. 157-58).  His taxes were not withheld from his pay and he was not provided benefits.  (Russell Depo., D.E. 14-3, pp. 153-56).  Plaintiff states he disciplined a supervisor (Russell Depo., D.E. 14-4, p. 163), but according to Malenky, plaintiff was reprimanded for doing so (Decl. of Jeff Malenky, D.E. 14-2, para 15).  It is a bit disengenuous of Degussa to claim that it had no control over Malenky but he was to do exactly what they told him to do in terms of providing training to employees and assistance to and coverage for the plant manager.  Because the right to control an employee's conduct is the most important of the considerations, it appears that plaintiff fits the definition of an employee for purposes of ADA and ADEA.  At a minimum, factual disputes preclude entry of summary judgment in favor of defendant on this issue.

## C.  Americans With Disabilities Act

Even if plaintiff's ADA claim is not barred by limitations[4], it fails on the merits.  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other

---

[4]Though plaintiff failed to articulate the specific dates and actions of Degussa which violate the ADA, it appears his ADA claim arose in March of 2004 which his status was changed from employee to consultant.

12

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  The term "disability" means, with respect to an individual, (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12101(2).

In his complaint, plaintiff asserts that he was able to perform the essential functions of his job with an accommodation, but he does not specify what accommodation was needed.  He also avers that he was discriminated against on the basis of his record of having a disability.

A plaintiff makes out an ADA claim when he proves (1) that he has a disability; (2) he is a "qualified individual" for the job in question; and (3) an adverse employment decision was made because of his disability.  Robertson v. Neuromedical Center, 161 F.3d 292, 294 (5th Cir. 1998).  In order for plaintiff to show that he has a disability, he must first show that he has a physical or mental impairment, and then show that it substantially limits one or more of his major life activities.

At plaintiff's deposition he testified that by the time he began to work as a consultant at Degussa he had recovered from his post-traumatic stress disorder, severe anxiety and major depression (Russell Depo., D.E. 14-4, pp. 183-184).  He said that he had recovered from those impairments and was totally healed from the disability he had suffered while he was out on leave (Id. at 184).  He described himself as being in excellent physical and mental health (Id. at 190-191).  Dr. Estrada, plaintiff's psychiatrist, wrote a letter dated February 6, 2004 in which he stated that plaintiff had been under his care since March 2002 for the treatment of major depression and post-traumatic stress disorder but was fully recovered and could return to work at his previous level of responsibility (Estrada Letter, D.E. 14-5, p. 11).

13

Plaintiff attached an affidavit from Dr. Estrada to his response to the motion for summary judgment which stated that although he said in February 2004 that plaintiff was fully recovered and able to return to work, he wanted to clarify that major depression and post-traumatic stress disorder are chronic and potentially disabling conditions that require ongoing treatment for the person to recover his capacity to function.  Dr. Estrada added that recovery or remission is not a cure and that although plaintiff had fully recovered his capacity to function, he still requires treatment to prevent a relapse.  Dr. Estrada likened plaintiff's condition to diabetes in that he requires continued treatment if he is to stay in recovery (Affidavit of Carlos Estrada, M.D., D.E. 15-2, p. 1).

The Supreme Court has held that despite the potential for a relapse, if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of the measures must be taken into account when judging whether that person is substantially limited in a major life activity and "disabled" under the Act.  Sutton v. United Airlines, Inc., 527 U.S. 471, 482, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450 (1999).

> A disability exists only where an impairment 'substantially limits' a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken.  A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity.  To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

Id., 527 U.S. at 482-483, 119 S.Ct. at 2146-2147.

Although plaintiff's depression and post-traumatic stress disorder are chronic conditions, both conditions are controlled by medication and therapy.  According to plaintiff and his doctor, by 2004 plaintiff was fully capable of functioning in his prior position at Degussa, despite the

14

fact that he suffers from chronic mental impairments.  Accordingly, he is not disabled for purposes of the ADA.

Plaintiff also testified that he did not ask Degussa to provide him with any kind of accommodation other than to give him his job back (Russell Depo., D.E. 14-4, p. 192).  In his affidavit, plaintiff explained that at his deposition he did not understand the concept of "accommodation" which is why he said that all he wanted was to be reinstated to his old position.  He also conceded that he did not request an accommodation at the time (Russell Aff., D.E. 15-2, p. 3).  Plaintiff added that it is clear though that because of his disability he would need to delegate the more stressful aspects of his job to an assistant and have flexibility with his schedule and hours (Id.).

Under the ADA an employer is not required to reallocate essential functions of a job to another employee.  29 C.F.R. Pt. 1630, App. § 1630.2(o).  The essential functions are by definition those that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position. Id.  Plaintiff does not specify which "stressful aspects" of his job he would want to delegate to an assistant, but it is difficult to imagine that the stressful aspects of his job would be anything other than the essential functions of his job.

Plaintiff cannot make out a claim that he suffers from a disability that falls within the parameters of the ADA.  Nor can he show that even if he were disabled, that there is a reasonable accommodation that defendant could make which would allow him to return to his old job.  For these reasons, summary judgment in favor of defendant on plaintiff's ADA claim is recommended.

**D.  Age Discrimination in Employment Act**

Plaintiff's ADEA claims likewise fail on the merits.  "Under the ADEA, it is unlawful for

an employer 'to fail or refuse to hire or to discharge any individual or otherwise discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's age.'" Machinchick v. PB Power, Inc., 398 F.3d 345,

349-50 (5th Cir. 2005)(citing 29 U.S.C. §623(a)(1)).  Plaintiff failed to describe dates, times, and

actions of Degussa which violate the ADEA, but it appears plaintiff is complaining of: (1)

Degussa's failure to rehire plaintiff as an employee in March 2004 (barred by limitations)

(Complaint, D.E. 1 @ ¶ 12); (2) Degussa's termination of his consulting services in October

2004 (not barred by limitations) (Complaint, D.E. 1 @ ¶ 12); and (3) Degussa's maintenance of a

highly stressful work environment which had a disparate and adverse impact on older workers

(Complaint, D.E. 1 @ ¶ 13).

In the Fifth Circuit, claims under the ADEA are analyzed in the same manner as Title VII

discrimination claims.  Bodenheimer v. PPG Industries, Inc., 5 F.3d 955, 957, n. 4 (5th Cir.

1993).  The analysis of a Title VII case is well known:

> The plaintiff must establish a prima facie case that the defendant made an employment
> decision that was motivated by a protected factor.  Once established, the defendant bears
> the burden of producing evidence that its employment decision was based on a legitimate
> nondiscriminatory reason.  The burden then shifts back to the plaintiff to prove that the
> defendant's proffered reasons were a pretext for discrimination.  But, if the defendant has
> offered a legitimate nondiscriminatory reason for its action, the presumption of
> discrimination derived from the plaintiff's prima facie case 'simply drops out of the
> picture,' . . .and 'the ultimate question [is] discrimination *vel non*.'

Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089-90 (5th Cir. 1995)(citing St. Mary's Honor

Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Texas Dept. of

Community Affairs v. Burdine, 450 U.S. 246, 253-257, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207

16

(1981);  McDonnell Douglas Corporation v. Green, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36

L.Ed.2d 668 (1971)).

      The focus then shifts to the ultimate question of whether the defendant intentionally

discriminated against the plaintiff.  Grimes v. Tx. Dept. of Mental Health, 102 F.3d 137, 140 (5th

Cir. 1996)(citing Hicks, 509 U.S. 502, 510-511, 113 S.Ct. 2742, 2749, 124 L.Ed.2d 407 (1993)).

Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence and may

do so by demonstrating that a defendant's articulated non-discriminatory reason was pretextual.

Grimes, 102 F.3d at 141 (citations omitted).  A plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, may, but does not

necessarily, permit the trier of fact to conclude that the employer unlawfully discriminated.

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105

(2000).  "Whether judgment as a matter of law is appropriate in any particular case will depend

on a number of factors.  Those include the strength of the plaintiff's prima facie case, the

probative value of the proof that the employer's explanation is false, and any other evidence that

supports the employer's case and that properly may be considered on a motion for judgment as a

matter of law."  Id., 530 U.S. at 148-149, 120 S.Ct. at 2109.

      **1.**     **Failure to rehire and termination of consulting services**

      In order to make out a prima facie case of age discrimination on plaintiff's failure to hire

(or rehire, as is the case here) claim, a plaintiff must show: (1) he is a member of the protected

class; (2) he was qualified for the position sought; (3) he was not selected; and (4) the position

was filled by another person outside of the protected class or by someone younger, or he was

17

otherwise not selected because of age.  McClaren v. Morrison Management Specialists, Inc., 420 F.3d 457, 462 (5th Cir. 2005).

In order to make out a prima facie case of age discrimination on plaintiff's termination claim he must prove (1) he was a member of a protected class; (2) he was qualified for the position he held; (3) he was discharged; and (4) after being discharged he was replaced by someone outside the protected class, or replaced by someone younger, or otherwise discharged because of his age.  Meinecke v. H & R. Block of Houston, 66 F.3d 77, 83 (5th Cir. 1995).

In this case, plaintiff, 59, was a member of the protected class.  For purposes of this summary judgment motion, it will be assumed that plaintiff sought and was qualified for the position he held prior to leaving Degussa in September 2001 and that he was qualified for the consulting position he held before his termination in October 2004.  Plaintiff was not rehired in his old position, and his consulting services were terminated.  Accordingly, he met the first three prongs of the prima facie case for failure to rehire and termination.  However, regarding the fourth prong, defendant submitted a statement form Jeff Malenky, the vice-president of human resources at Degussa, that plaintiff was not reemployed by Degussa because there were no open positions for him.  Although he was retained as a consultant on a temporary basis, once he had performed those functions, Degussa did not want to continue the consulting relationship.  Malenky further stated that the decision to not re-employ plaintiff and to discontinue the consulting relationship was not based on plaintiff's age or disability (Malenky Aff., D.E. 14-2, pp. 3-12).

Plaintiff has provided no evidence to contradict Malenky's assertions regarding defendant's decision not to rehire him.  Though plaintiff stated at his deposition and in his EEOC

complaint that he believed Justin Lang, a younger person was promoted to operations manager after plaintiff gave notice of his intent to return to work in March 2005 (Russell Depo., D.E.14-4, p. 137; D.E. 14-5, pp. 27-28), he failed to produce employee records to show that this was the case.  In any event, plaintiff's belief does not rebut Malenky's statement in his affidavit that defendant's position as Senior Operations Manager was eliminated when plaintiff left on disability.  Nowhere does the ADEA require that a company create or re-create an unnecessary position after an employee returns from disability leave.  There is no evidence in the record that Degussa either sought or hired someone else to fill plaintiff's position, Senior Operations Manager.  There is no evidence that Degussa sought or hired younger consultants to perform plaintiff's work after October 2004.  Without such evidence, plaintiff cannot establish a prima facie case of age discrimination and defendant is entitled to summary judgment.

       2.       **Disparate Impact**

Plaintiff also alleges that Degussa maintained a highly stressful work environment that necessarily subjected older, more experienced workers to extreme pressures which had a disparate impact on older workers (Complaint, D.E. 1 at ¶ 13).  While the Supreme Court has held that the ADEA authorizes recovery in disparate impact cases, the Court has held that it is not sufficient to simply allege disparate impact on older workers or to point to a generalized policy that leads to such an impact.  Smith v. City of Jackson, Miss., 544 U.S. 228, 241, 125 S.Ct. 1536, 1545 (2005).  The employee is "responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Id.* (internal quotations and citations omitted).  Plaintiff has completely failed to do so here, and defendant is entitled to summary judgment on this claim.

**E. Intentional Infliction of Emotional Distress**

To make out a claim of intentional infliction of emotional distress, a plaintiff must show 1) the defendant acted intentionally or recklessly; 2) the conduct was extreme and outrageous; 3) the actions of the defendant caused the plaintiff emotional distress and 4) the emotional distress suffered by the plaintiff was severe.  Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993). Conduct is sufficiently extreme and outrageous where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Id.  Whether conduct satisfies this criteria is initially a question of law for the court.  If the court determines that reasonable people may differ, then it is for the jury to decide whether the conduct is sufficiently extreme and outrageous to result in liability.  George Grubbs Enterprises, Inc. v. Bien, 881 S.W.2d 843 (Tex.App.--Fort Worth, 1994, *rev'd. on other grounds*, 900 S.W.2d 337 (Tex. 1995)).

In an employment context, actions that fall within the realm of an ordinary employment dispute will not be found to be extreme and outrageous.  When employment actions violate federal anti-employment discrimination laws, even the most deplorable conduct, except in very unusual cases, is not the sort of conduct that constitutes extreme and outrageous conduct.  See Wilson v. Monarch Paper Co., 939 F.2d 1138, 1145 (5th Cir. 1991)(intentional infliction of emotional distress found when former vice-president with college degree and 30 years experience in industry was demoted to doing mostly janitorial work);  Dean v. Ford Motor Credit Co., 885 F.2d 300, 304-305, 306-307 (5th Cir. 1989)(placing checks in plaintiff's purse to make

it appear that she was a thief or to put her in fear of criminal charges was intentional infliction of emotional distress).

In his complaint, plaintiff sought damages for intentional infliction of emotional distress, claiming that he was humiliated when he was invited to play golf with Degussa employees who proceeded to criticize and mock him because of his disability.  However, at his deposition, plaintiff stated that the only thing that was discussed at the meeting was his relationship with Mike Smith.  He denied that the other employees talked about any of his mental impairments or the fact that he had been out on disability leave (Russell Depo., D.E. 14-4, pp. 199-200).  It is clear in this case that plaintiff has failed to make out a claim for intentional infliction of emotional distress.[5]  Summary judgment should be entered for defendant.

## RECOMMENDATION

Based on the foregoing, it is respectfully recommended that defendant's motion for summary judgment (D.E. 14) be granted.  Summary judgment in favor of the defendant should be entered on plaintiff's ADA, ADEA and intentional infliction of emotional distress claims.

Respectfully recommended this 6th day of February, 2007.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

---

[5]Defendant also argues that the intentional infliction of emotional distress claim is barred because it is predicated on the same facts as his employment discrimination case, citing in support Hoffman-LaRoche Inc. v. Zeltwanger, 144 S.W.3d 438 (Tex. 2004).  Because it is clear that plaintiff has failed to state a claim for intentional infliction of emotional distress, defendant's argument is not addressed.

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).